ORIENTAL, The. See Case No. 10.569a.

ORIENTAL, The (CROSBY v.). See Case No. 3,424a.

ORIENTAL, The (RUSSELL v.). See Case No. 10,569a.

ORIENT MUT. INS. CO. v. The DOLPHIN. See Cases Nos. 3,973 and 3,974.

---

## Case No. 10,571.

### The ORIFLAMME.

[1 Sawy. 176.] [1]

District Court, D. Oregon. May 16, 1870. [2]

CARRIER MAY SHOW THAT PACKAGE WAS SECRETLY DEFECTIVE—BURDEN OF PROOF.

1. Although the bill of lading states that a package was received in good order, the carrier may, nevertheless, show that it was secretly defective or insufficient.

2. The burden of proof is upon the carrier to show that a package receipted for in good order, was in fact secretly defective or insufficient: and unless he does so he is liable for the contents in case of loss.

In admiralty.

David Friedenrich, for libellants.
John H. Mitchell, for defendants.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]
[2] [Affirmed by circuit court; case unreported.]

DEADY, District Judge. This suit was commenced on November 6, 1860, to recover $400 damages for the non-delivery of certain high-proof spirits, shipped on the Oriflamme at San Francisco for the port of Portland. From the evidence, it appears that the libellants, on October 29, 1869, at San Francisco, shipped on the Oriflamme, to be delivered at Portland, two pipes of spirits, 90 per cent. proof. One of the pipes was delivered in good order. The other was found on the wharf at Portland about an hour after it had been discharged from the ship, by the drayman of the libellants, lying on its side, and leaking around its chine at one end, so as to drop freely from the lower side of the chine upon the wharf. The drayman informed the libellants of the condition the pipe was in, and one of the latter went down to the wharf with the former, and finding the pipe leaking as above stated, set it up on end, when it stopped leaking. Thereupon the libellant called the attention of the freight clerk, purser and wharfinger to the condition of the pipe, and it was arranged or agreed between the libellant and clerk and purser that the pipe should be taken to the store of the former and the amount of the loss ascertained, with a view to making a reclamation for the loss. The pipe contained 125 gallons, or what was equal to $237 \frac{50}{100}$ gallons of proof spirits. At the store the contents remaining were pumped out and it was found that 91 gallons, or what was equal to $172 \frac{90}{100}$ gallons of proof spirits were lost. The purser accompanied the pipe to the store and the bill for the leakage was immediately presented to him by the libellant Hillburg, but he declined to pay it, without giving any reason for not doing so.

A number of witnesses were examined on each side, as to the condition and sufficiency of the pipe, including two of the libellants, and the master, freight clerk and purser of the ship. In addition, the court, with the counsel, for the parties, examined the pipe. By the bill of lading it is admitted that this and a similar pipe were "shipped in apparent good order." The word "apparent" does not change the legal effect of the bill of lading. The receipt of the goods and giving a bill of lading therefor is prima facie evidence that they were in good order, without an explicit statement to that effect; but in any case, the admission is limited to the external or apparent condition of the package, so far as the same is open to ordinary observation. Therefore, if a loss occurs, the carrier is not precluded from showing that it proceeded from some latent cause or secret defect in the package. But under the circumstances, the burden of proof is upon the carrier, to show that the goods were not in fact in good order, and that, therefore, he is not responsible for the loss.

The pipe in question is about four feet six inches long and near three feet in diameter

at the bilge, and is evidently a second-hand one. The quarter and bilge hoops have been driven up nearly an inch, as is shown by the rust marks left upon the staves. But this only indicates that the pipe has been in use long enough to rust the hoops on the inside, and that thereby they became enlarged and loosened and required to be driven up. The staves are oak, a full inch thick, and in a sound condition. No worm holes or other defects can be seen in the pipe, and no witness testifies to having discovered any. There are two hoops at each chine. The leakage all occurred at one chine of the pipe, and the hoops at that chine had been driven or forced outwardly about a quarter of an inch for at least one half of the circumference of the pipe.

From the testimony of the officers of the ship, it appears that the pipe was rolled from the wharf on to the deck at San Francisco and then slung with ropes into the lower hold, and stowed fore and aft on a "bed," or pieces of wood laid "athwart ships," but whether there was only a single piece of wood or dunnage under each end of the pipe or more, does not appear. On top of the pipe there were stowed case goods for about five or six feet in depth. The leaking condition of the pipe was not noticed by the officers until after it was discharged at Portland, but the first officer testifies that he stowed it, that its position was not changed during the voyage, and that he noticed the deck was wet where it laid.

Bolles, the master, testified that he examined the pipe on the wharf at Portland, and that there was putty or clay packed around the chine of the head where the leak occurred, and painted over, and that the motion of the ship had started this putty or clay out and caused the leak. This is the only witness for the claimant that attempts to account for the leak in this way, but my own inspection of the pipe concurs with the testimony of the other witnesses, that there was no putty or clay, or anything of the kind, in the chine of the pipe. The freight clerk did say that in San Francisco, when he was receiving the two pipes on the wharf, he "thought once that one of the heads was cracked and covered up with mud or putty and painted over." But which head it was, and of which pipe, and whether he thinks so still, he does not testify. As he receipted for both pipes in good order, it is not to be presumed that he then thought that either head of either pipe was cracked and covered up with mud or putty.

Wormser, of Wormser Bros., of San Francisco, testified that they shipped these two pipes to libellants, and that they were full and in good condition. That they purchased them of the California Commercial & Manufacturing Company and had had them in their possession about a month, during which time they never leaked.

Bottler, a cooper called by claimant, testified that he had examined the pipe at request of one of the officers of the ship, and that he "thought the staves rather light for such a large cask, and in his opinion this was the cause of the leakage."

Hulery, a cooper called by the libellants, testified that on November 4, he examined the pipe in question, at the request of the claimants, and that it was sufficient to carry high proof spirits. That the pipe had been stowed with only two bearings, each about half way between the bilge and the chine, and that the weight of the pipe and the freight upon it had pressed the staves in at this point, where it lay upon the dunnage, and thus opened them at the chine which caused the leak; and that a pipe of this size should be stowed so as to have four bearings. He also stated that the chine hoops, at the end where the leak occurred, were not up to their place by one fourth of an inch.

The loss of the spirits is established beyond controversy, and the bill of lading shows that apparently the pipe was in good order—was a proper and sufficient vessel in which to ship the spirits. This makes a prima facie case upon which the libellants are entitled to a decree, unless the claimant overcomes it by proof to the contrary. It is not sufficient that the evidence should raise a doubt as to the sufficiency of the cask, it must establish the fact that it was not in good order. Otherwise the admission in the bill of lading must be considered as true.

The evidence before the court does not, in my judgment, establish that the pipe was insufficient in any particular, but rather the contrary. The loss must be presumed to have occurred from the negligence or unskillfulness of the carrier or his employees. It is not necessary to determine how it was done, although it is highly probable that it occurred as suggested by the witness Hulery. And here I must remark, that it does not speak very well for the diligence and care of those having charge of this package, that it should have been discharged upon the wharf and left to lie there on the bilge with the contents dripping out at the head, until it was found and set up by one of the libellants and his drayman.

Consequence, in this connection, is sought to be given to the clause in the bill of lading, whereby it is agreed that the claimant "is not accountable for leakage or breakage arising from improper or defective packages or casks." But this provision does not alter the law or affect this case. The claimant would not be liable for a loss "arising from improper or defective packages or casks" whether this clause was in the bill of lading or not. The question here is, did the leakage occur because the pipe which contained the spirits was an improper one or defective? The burden of proof is upon the claimant, to show that the loss arose from the insufficiency of the cask.

The only direct evidence in the case against the sufficiency of the cask is the expression of Bottler, that he "thought the staves were too thin for such a large cask." No reason is given for this opinion, nor did the witness attempt to state how thick the staves should be. Thick and thin are relative terms and have no particular signification unless used with reference to some admitted or established standard of thickness or thinness. Of course, upon this point I make no account of the story of the putty or mud in the chine. as that is evidently a mistake. Hulery. who impressed. me with his fairness and intelligence, thought the cask a sufficient one, and stated that it was usual to ship high proof spirits to this port in such casks. Upon this question of the strength of the staves some weight ought to be given to the fact that the manufacturers in San Francisco put these spirits in this cask in the course of their business, and that the wholesale dealers shipped them in this condition, to their customers in Portland, after the pipe had been in their possession and under their eye for a month. The thickness of the staves was a matter within ordinary observation, and both the manufacturers and dealers must be presumed to have deemed the pipe sufficient in that respect.

In The Live Yankee [Case No. 8.409], the case turned upon the question, whether the shipping of the staves in the head of a wine cask whereby the contents leaked out, was the result of an insufficient or defective cask, or ill handling, or stowage by the carrier. The casks were receipted for in good order. The court decreed for the libellants, and said: "What caused the shifting of the staves, and whether the head was of proper material and workmanship to support the ordinary handling and pressure of such a voyage, may admit of difference of opinion. The respondents have not shown that there was any secret defect or insufficiency about the cask to cause this leak. By their receipt they acknowledged, that the cask was in good order when they received it. * * * Unless, then. this injury or slipping of the stave was the necessary or probable result of the insufficiency of the workmanship or material of the cask or some part of it, the libellants are entitled to recover."

So in the case at bar; the claimants having failed to show that the leakage and loss were the necessary or probable result of the insufficiency of the pipe from lack of strength, decay, or other defects, the legitimate and only conclusion is, that it occurred through the fault of the carrier. and the libellants must therefore recover.

The loss was 91 gallons. which reduced to proof spirits gives 172 90-100 gallons. This was worth at this port at the time of the non-delivery $1.50 per gallon in coin, which reduced to currency at 88 cents on the dollar makes the loss $294.71. Add to this six months interest at the legal rate ($14.73) and the sum is $309.44 for which the libellants must have a decree, with costs and expenses of suit.

[On appeal to the circuit court. the decree of this court was affirmed. Case unreported.]